Application of Philip deC. KRATZ and Louis J. Strasburger.

Appeal No. 78–581.

United States Court of Customs and Patent Appeals.

March 1, 1979.

Arthur L. Liberman, New York City, Franklin D. Wolffe, Washington, D. C., attorneys of record, for appellants.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents; Jack E. Armore, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

BALDWIN, Judge.

This is an appeal from the decision of the Patent and Trademark Office (PTO) Board of Appeals (board) affirming the examiner's rejection of claims 11 to 13 and 16 to 18[1] under 35 U.S.C. § 103 in application No. 683,353, filed May 6, 1976, entitled "Process For Producing Strawberry Flavor Compositions and Products." The application is for a reissue of U. S. Patent No. 3,499,769, filed September 14, 1966, and issued on March 10, 1970. We reverse.

### The Invention

Appellants have found that the addition of a small amount of substantially pure 2-methyl-2-pentenoic acid (hereafter 2M2PA) to foods imparts a fresh fruit or strawberry flavor to those foods.

Claims 17 and 18, newly added in this reissue application, are illustrative of the invention.

17. A process for imparting a strawberry flavor or aroma to a foodstuff which comprises adding thereto from about 0.5 up to about 25 parts per million, based on the weight of said foodstuff of a composition consisting essentially of synthetically produced substantially pure 2-methyl-2-pentenoic acid.

18. A flavor modifying composition useful in imparting a strawberry flavor to a foodstuff consisting essentially of (i) from 1 to about 20% by weight of said flavoring composition of synthetically produced substantially pure 2-methyl-2-pentenoic acid and (ii) the remainder of said composition being at least one adjuvant for said 2-methyl-2-pentenoic acid, selected from the group consisting of geraniol, ethyl methyl phenyl glycidate, vanillin, ethyl pelargonate, isoamyl acetate, ethyl butyrate, naphthyl ethyl ether, ethyl acetate, isoamy butyrate, diacetyl, cinnamic acid, oil of cinnamon and decalactone.

### The References

The board did not apply any reference as prior art but rather applied Mussinan et al. and Kratz as evidence of scientific fact.

The references discussed by the board are:

---

1. No appeal is taken from the decision of the board affirming the rejection of claims 9, 10, 14 and 15.

Mussinan and Walradt, *Organic Acids from Fresh California Strawberries*, 23 J. Agric. Food Chem. 482 to 484 (1975).

Kratz, *The Flavor Components of Strawberry*, Termination Report FL–243/May 2, 1969, unpublished report for internal use at International Flavor and Fragrances, Inc.

Bedoukian, *Progress in Perfumery Materials*, 88 Cosmetics and Perfumery 31 (April 1973).

*The New York Times*, November 26, 1977, Business/Finance section at 1 & 27.

*The Washington Star*, December 4, 1977, at G–1 & G–6.

Mussinan et al. discussed, in some detail, the methods used to extract "volatile acids" from fresh strawberries. The thus-extracted acids (including 2M2PA) were analyzed on a mass spectrometer after separation via a gas chromatograph. Of the "33 acids identified, 22 are being reported for the first times as constituents of strawberry."

The internal memorandum authored by Kratz professed the objective of the work (on strawberry flavor components) to be the obtention of "knowledge, not available in the literature, concerning their identity and relative concentration." In excess of 100 compounds were identified. The report suggested that "free volatile acids [including 2M2PA] appear to be important."

Bedoukian is cited by the examiner because of the following statement:

It appears that in some cases it has been possible to obtain patent rights on the use of naturally occurring materials. For instance, if compound X is found in oil of jasmine and contributes to the fragrance of jasmine oil, one would expect that anyone would have the right to use compound X in jasmine composition, and its use in that manner should not be patentable. Or consider the case of a compound which plays a role in the flavor of peaches. The appearance of patents describing its importance in peach aroma, thereby preventing its usage by others, seems hardly fair or legal. It would be possible for a few major companies, with ample research facilities, to corner the market in the use of newly discovered natural components in plants or fruits. Each would prevent all the others, including the remaining minor firms, from developing a better product by using these natural components. The end result would certainly not be to the best advantage of the public.

*The New York Times* and *The Washington Star* articles were submitted, in an apparent abundance of caution, by appellants. Each article contained a similar quotation by one Alfred Goossens, the "chief flavorist" for the assignee of this application. That quotation reads:

"When we want to create a flavor or fragrance, we first see how Mother Nature did it," Goossens says. "Suppose we're interested in the strawberry. What makes it smell and taste like a strawberry rather than gasoline? We buy a few truckloads of strawberries and our chemists extract them. Sophisticated machines, including computers, help us out. Once we determine the chemicals we synthesize them, and then our creative people start mixing."

### Background

As noted above, this application is for a reissue of U.S. No. 3,499,769, issued on March 10, 1970. The declaration averred that the appellants "only had a right to claim the use of 2-methyl-2-pentenoic acid in substantially pure form, excluding the 2-methyl-2-pentenoic acid found in nature" in that the Kratz internal memorandum (in 1969) and the Mussinan et al. article (in 1975) suggest that 2M2PA is a naturally occurring component of strawberries.

The rejection, as found in the Examiner's Answer succinctly states:

All the claims stand rejected under 35 U.S.C. § 103 as unpatentable over each of Mussinan et al. and Kratz who disclose that the claimed compound is a natural constituent in strawberries. The analysis of natural constituents of foods is now conventional as it was at the time of filing of the original application. To analyze strawberries, identify the claimed constituent and use it in its obvious environment, e. g. food or flavoring, would be obvious to the ordinary worker in the art.

Attention is directed to the Kratz paper, cited above, which sets forth that inventor Kratz did not do anything more than analyze strawberries so that the information derived from the analysis could be used to improve imitation strawberry flavor.

There is nothing in the record to indicate unobvious subject matter. On the contrary, the record establishes that applicants have done no more than do the expected analysis for the expected objective.

The recitation in the claims of the use of the "substantially pure" or "synthetically produced substantially pure" are not seen to influence the conclusions reached. The synthetic or substantially pure compound would be obvious over the natural constituent.

The board agreed, in its opinion, with the examiner's position and responded to a number of appellants' arguments:

The appellants do not refute the examiner's basic position that 2-methyl-2-pentenoic acid is a naturally occurring product found in strawberries nor do we find any argument specifically directed to the point that it would be unobvious to use compounds found in strawberries in compounding flavoring of this nature. Despite these acknowledgments, appellants argue that under the specific circumstances of this case, the addition of a substantially pure synthetically produced 2-methyl-2-pentenoic acid to a foodstuff is unobvious.

In support of the above position, it is first asserted that the compound in question was isolated and identified in strawberries only after a long and difficult analysis that employed advanced analytical technology such as nuclear magnetic resonance, gas chromatography and infra-red spectroscopy. It is further argued that the berries contain a wide variety of compounds and it is unexpected to select one compound in particular that would augment the aroma and flavor of the berry fruit flavor. Reliance is also placed on the Rule 132 affidavit of Vock [2] which is alleged to establish the unexpected superiority of the flavoring when small amounts of the 2-methyl-2-pentenoic acid are included in the flavoring composition. In addition, the Mussinan Rule 132 affidavit [3] is relied upon to establish the low level of the acid in the fruit as compared to the levels recited in the claims.

2. The Vock affidavit provided a qualitative comparison of the taste and aroma of several diluted strawberry juice solutions (with added sugar) containing the following: 1) The "acid fraction" of fresh California strawberries (the natural source of 2M2PA), 2) 2M2PA, and 3) control (no additives). The affidavit stated "[t]his is a subjective test but an accepted procedure for evaluating the relative suitability of candidate compounds as ingredients in foodstuffs, if the test is carried out by a professional flavorist or flavor chemist." Vock, a flavor chemist, indicated that 2M2PA "adds to the aromatic top notes and improves the sweet strawberry jam character of the juice." Another test in which the "acid fraction," 2M2PA, and diluted strawberry juice were added to food grade ethanol and tasted, produced a similar evaluation by Vock. At a concentration of 5ppm, 2M2PA approximated "the taste and aroma of strawberry juice."

3. The Mussinan affidavit merely indicated that, on the basis of the work supporting her article in the *Journal of Agricultural Food Chemistry*, California strawberries contain 0.75% total free acids and 2M2PA is present in amounts less than 0.5 parts per million. She also stated that she transmitted an amount of the "acid fraction" to Dr. Vock.

We have carefully examined each of the appellants' arguments as well as the affidavits of record but are not persuaded that they establish the claimed subject matter as unobvious to those of ordinary skill in the art. Based upon all the evidence of record, appellants were apparently the first to establish the presence of 2-methyl-2-pentenoic acid in fresh strawberries and we do not take issue with the position that the determination of its presence required the use of sophisticated analytical equipment. As to the latter point, we are unaware of any holdings that the degree of difficulty encountered in developing claimed subject matter is or should be evaluated in determining the unobviousness of the claims over the teachings of the prior art. As we understand the record, appellants did not invent or develop any of the equipment used in the initial determination but merely employed existing techniques that were available to determine the presence of small amounts of materials in various unknown samples. Furthermore, appellants were apparently not the first to discover or synthesize 2-methyl-2-pentenoic acid in a substantially pure form, which was one of the basic considerations evaluated by the Court in *In re Bergstrom et al.,* 427 F.2d 1394, [57 CCPA 1240] 166 USPQ 256. Neither do we find the facts considered by the Court in *Merck vs. Chase,* [D.C., 273 F.Supp. 68] 155 USPQ 139 applicable in the instant case. The substantially pure 2-methyl-2-pentenoic acid does not differ from that known in the art, its sole distinction being the claimed use in a composition to impart an enhanced fresh fruit flavor and this is at the heart of the rejection.

## OPINION

Some prior dicta exist which would seem to support the proposition that a claim broadly reciting a naturally occurring chemical compound may be rejected as unpatentable over a naturally occurring composition containing that compound even though the compound's existence is not known. For instance, in *In re Bergstrom,* 427 F.2d 1394, 57 CCPA 1240, 166 USPQ 256 (1970) (a case in which such a rejection was overcome), claims reciting substantially pure prostaglandin compounds (denominated $PGE_2$ and $PGE_3$) were rejected under 35 U.S.C. § 101 on the basis that the compounds were not "new". The examiner argued that the compounds occurred inherently "in nature," i. e., in sheep prostate glands, and in previously known crude extracts of those glands.

This court disposed of the § 101 question by holding that:

[T]he criteria for determining whether given subject matter is "new" within the meaning of § 101 are no different than the criteria for determining whether that subject matter possesses the "novelty" expressed in the title of § 102. The word "new" in § 101 is defined and is to be construed in accordance with the provisions of § 102. [*Id.* 427 F.2d at 1401, 57 CCPA at 1249, 166 USPQ at 262.]

The court then considered the *novelty* of the pure compounds:

[T]he fundamental error in the board's position, as we see it, is the analysis and answer it gave to the sole issue it accurately posed—"whether the *claimed* pure materials *are novel* as compared with the *less pure* materials of the reference." [Emphasis supplied.] It seems to us that the answer to that question is self-evident: by definition, pure materials necessarily differ from *less* pure or impure materials and, if the latter are the only ones existing and available as a standard of reference, as seems to be the situation here, perforce the "pure" materials are "new" with respect to them. [Footnote omitted. *Id.* 427 F.2d at 1401, 57 CCPA at 1250, 166 USPQ at 262.]

This statement was, in turn, based on an observation:

[W]hat appellants claim—pure $PGE_2$ and pure $PGE_3$—is not "naturally occurring."

Those compounds, as far as the record establishes, do not exist in nature in pure form, and appellants have neither merely discovered, nor claimed sufficiently broadly to encompass, what has previously existed in fact in nature's storehouse, albeit unknown, *or* what has previously been known to exist. [*Id.* 427 F.2d at 1401, 57 CCPA at 1249, 166 USPQ at 261. Emphasis in original.]

In *Bergstrom*, the treatment of "novelty" by the board was error. Although "new" is mentioned in § 101, it is *applied* under § 102.

A similar situation is found in the well known "Vitamin B–12" cases. *Merck v. Olin Mathieson Chemical,* 253 F.2d 156, 116 USPQ 484 (4th Cir. 1958); *Merck v. Chase Chemical,* 273 F.Supp. 68, 155 USPQ 139 (D.N.J.1967). The patentees in these cases were the first to separate and purify vitamin B–12. Those of ordinary skill in the art knew that certain extracts of liver were active in combating pernicious anemia. Those workers did not know what it was in the liver extracts that controlled the anemia nor did they have any understanding of the chemical nature of whatever that something in liver was. Although the patentees recovered the compound from a source containing a microorganism, fellow workers at Merck demonstrated that patentees' invention was the same compound as found in liver. *Id.* at 83, 155 USPQ at 151, ftn. 9.

Nevertheless, in each of these cases, the invention recited in the claim was found to be novel since the claims did not cover any natural composition.[4]

It should be clear that an anticipation rejection in such a case is necessarily based on a dual footing. First, the natural composition must inherently contain the naturally occurring compound. Secondly, the claim must be of sufficient breadth to encompass both the known natural composition and the naturally occurring compound.

Clearly, the claims in the case at hand do not fit these requirements. Appellants do not seek to claim 2M2PA, per se, nor 2M2PA in its natural state, nor even a composition encompassing strawberries; but instead present claims to compositions containing "substantially pure" 2M2PA and preparative methods thereof. Since the claims do not encompass natural compositions, in that "substantially pure" 2M2PA does not apparently occur in nature, one portion of the test is not met.

The other half of the test is satisfied. Appellants properly concede in their brief that the Kratz and Mussinan et al. publications[5] establish the "inherent scientific fact"[6] that 2M2PA is a naturally occurring constituent of strawberries and is not "per se" novel.

The board did not attempt to apply this test, even though the *Bergstrom* decision was mentioned in its opinion, but instead formulated another theory. The board focused on the fact that the claimed compositions containing 2M2PA have the same utility as does the natural source of the compound, i. e., both taste like a strawberry. It then concluded that one having ordinary skill in this art would make an analysis of strawberries, determine the components re-

---

4. *Merck v. Olin Mathieson Chemical,* 253 F.2d at 160, 116 USPQ at 487; *Merck v. Chase Chemical,* 273 F.Supp. at 83, 155 USPQ at 151.

5. The publications themselves are not "prior art." Kratz is not a public document. See generally *In re Bayer,* 568 F.2d 1357, 196 USPQ 670 (CCPA 1978); *In re Land,* 54 CCPA 806, 368 F.2d 866, 151 USPQ 621 (1966); *In re Hilmer,* 53 CCPA 1288, 359 F.2d 859, 149 USPQ 480 (1966). Mussinan et al. was published af-

ter the filing date of U.S. Patent No. 3,499,769 (the patent for which this application seeks a reissue).

6. See *In re Langer,* 503 F.2d 1380, 183 USPQ 288 (CCPA 1974); *In re Marzocchi,* 58 CCPA 1069, 439 F.2d 220, 169 USPQ 367 (1971); *In re Wilson,* 50 CCPA 773, 311 F.2d 266, 135 USPQ 442 (1962).

sponsible for the taste, and using that acquired knowledge, proceed to the mixtures of the claims. The board further observed that the record established that appellants used such a process.

As to the *abstract* process of discovering flavor components, i. e., chemically searching the strawberry, we agree with the board that it is unquestionably obvious. The *Washington Star* and *New York Times* articles bolster this assessment.

 However, making weight of the method appellant used in finding the invention is beside the point. The last sentence of 35 U.S.C. § 103, with great clarity, excludes such methodology in stating that "[p]atentability shall not be negatived by the manner in which the invention was made."

Moreover, § 103 requires that the determination of obviousness be made upon a comparison of the "subject matter sought to be patented" and "the prior art." The prior art here, at the time the invention was made, consists of the natural strawberry and its attendant taste. The PTO provides no basis, found in that prior art, for selecting 2M2PA and using it in compositions such as those claimed by appellants.

▆ Even if the bare lists of compounds found in strawberries were in the prior art, those extensive lists are quite mute in directing one having ordinary skill in the art to *any* particular compound for *any* purpose. While recognizing that obviousness does not require complete predictability, *In re Kronig*, 539 F.2d 1300, 190 USPQ 425 (CCPA 1976), we would consider it necessary, even once 2M2PA is known, that the prior art itself further provide *some* foreseeability or predictability that the compound is a significant strawberry flavor ingredient. We have previously rejected the argument that undirected skill of one in the pertinent art is an adequate substitute for statutory prior art. *In re Antonie*, 559 F.2d 618, 195 USPQ 6 (CCPA

1977). We emphasize that there is a difference between somehow substituting skill in the art for statutory prior art, as the PTO attempts here, and using that skill to interpret prior art. *In re Bode*, 550 F.2d 656, 193 USPQ 12 (CCPA 1977); *In re Wiggins*, 488 F.2d 538, 179 USPQ 421 (CCPA 1973).

In sum, the PTO has provided no basis in the prior art for either selecting 2M2PA or thereafter using it to enhance strawberry flavor and taste.

Accordingly, we *reverse* the decision of the board.

*REVERSED.*